**[Cite as *In re L.F.*, 2025-Ohio-1643.]**

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: L.F.
    L.F.
    J.F.

C.A. Nos.     31253
                 31269
                 31270
                 31271

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 22 12 1079
                DN 22 12 1080
                DN 22 12 1082

## DECISION AND JOURNAL ENTRY

Dated: May 7, 2025

FLAGG LANZINGER, Presiding Judge.

**{¶1}** Appellants, R.G.-F. ("Mother") and J.F. ("Father") appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed three of their minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

### I.

**{¶2}** Mother is the biological mother of Li.F., born October 23, 2015; La.F., born May 29, 2017; and J.F., born April 12, 2011. Father and Mother are no longer married but, because they were married at the time of each child's birth, Father is presumed to be the father of these children. Mother and Father have other children who were also removed from their custody during

the trial court proceedings, but they are not parties to this appeal. Mother also had a 22-year-old son who died by suicide several months before this case began.

{¶3} These children were also removed from their parents' custody during prior dependency and neglect cases in 2018, but few details about those cases are included in the record. The juvenile court removed the children, adjudicated them neglected and dependent, and eventually returned them to Mother after she complied with the reunification requirements of the case plan. The record includes no details about Father's role, if any, during the prior cases.

{¶4} On December 9, 2022, CSB filed complaints to allege that Li.F., La.F., and J.F. (and Mother's three other minor children) were dependent because Mother was grieving the recent death of her adult son and was overwhelmed with caring for the six children in her home. The home was filthy and unsafe; two of the children had significant behavioral problems; one of the children had severe developmental delays and untreated physical problems; and Mother was struggling emotionally and financially to meet the family's basic needs. Although CSB had offered to develop a voluntary case plan, which would have allowed the children to remain in Mother's custody, Mother insisted that CSB remove the children from the home because she needed time alone to work through her grief, get her home in order, and allow the children to get the services that they needed because she was unable to control them.

{¶5} When this case began, Father was incarcerated after violating the conditions of his community control on a Ross County conviction of felony drug possession. Father remained incarcerated throughout most of this case. He wrote his children a few letters from prison, but did not visit them or work with CSB on reunification after he was released. Consequently, this Court will focus primarily on the facts pertaining to Mother.

**{¶6}** Mother and Father later waived their rights to adjudicatory and dispositional hearings. The trial court adjudicated the children dependent, placed them in the temporary custody of CSB, and adopted the case plan as an order of the court. The case plan required Mother to engage in consistent mental health counseling to learn how to manage her grief and stressors in her life; successfully complete a parenting program focused on dealing with children with developmental disabilities; demonstrate that she can use appropriate parenting techniques and set boundaries for all of her children; obtain and maintain clean, safe, and stable housing; and demonstrate that she can meet the financial and other basic needs of herself and her children.

**{¶7}** Shortly after the case plan was adopted, Mother was diagnosed with major depression, anxiety, and post-traumatic stress disorder. She began to engage in counseling to learn to appropriately cope with the loss of her adult son and other stressors in her life. She moved in with her boyfriend and his mother but admitted throughout this case that she could not have her children live there. Mother lacked housing for her children throughout this case.

**{¶8}** Mother did not begin parenting classes until this case had been pending for almost one year. Although the caseworker had referred Mother to two agencies that offered the parenting classes required by the case plan, which deal with the unique needs of children with developmental delays, Mother went to a third agency that did not offer such specialized parenting instruction. Moreover, Mother did not visit the children regularly, and she did not reach out to the children's counselors or to Li.F.'s school about the development and implementation of his individualized education plan. Consequently, Mother continued to lack a basic understanding of her children's developmental and emotional needs.

**{¶9}** After the children were placed in foster care, they began regular counseling to help regulate their emotions and behavioral outbursts. After the children spent several months in

counseling and adjusted to their foster homes, their counselors opined that each child was benefiting from counseling and the structure and stability of their respective foster homes. J.F. told his counselor that he was angry that he was back in foster care and that he worried about whether Mother would do what she needed to do to for the family to be reunified.

{¶10} CSB initially moved for permanent custody on October 31, 2023, and Mother and Father alternatively requested a six-month extension of temporary custody. Although Father remained incarcerated at the time, he attended the hearing and testified that he was due to be released from prison in less than three months and that, after his release, he intended to work toward reunification with his children. The trial court heard evidence that Mother had made progress in counseling and had maintained steady employment, but that she continued to have financial problems, had not obtained housing, nor had she taken parenting classes as required by the case plan. Mother testified that, if the trial court granted an extension of temporary custody, she would be able to comply with the remaining requirements of the case plan.

{¶11} Following the hearing on the alternative motions, the trial court denied the agency's first permanent custody motion and extended temporary custody because Mother had begun to make progress on the reunification requirements of the case plan and the court concluded that there was a reasonable probability that the children could be returned to Mother or otherwise permanently placed within the extension period. *See* R.C. 2151.415(D)(1).

{¶12} During the next several months, however, Mother did not attempt to engage in parenting classes to address children with developmental delays or otherwise take steps to understand the unique needs of her children. Mother continued in counseling but had not worked through the trauma of losing her son and continued to blame others or her busy schedule for her failure to comply with the case plan. The caseworker sent Mother numerous listings for available

rental homes and offered to help Mother financially with the first and last month's rent, but Mother did not secure a home for her children.

{¶13} On May 13, 2024, CSB again moved for permanent custody of these children. Mother alternatively requested legal custody of the children or another extension of temporary custody. Father filed no alternative dispositional motion and did not appear for the final hearing, although he was represented by counsel. After a hearing held during late September 2024, the trial court terminated parental rights and placed Li.F., La.F., and J.F. in the permanent custody of CSB.

{¶14} Mother and Father appeal and raise a total of three assignments of error. Because Father alleges procedural errors, this Court will address his arguments before Mother's challenge to the weight of the evidence supporting the trial court's judgment.

II.

### FATHER'S ASSIGNMENT OF ERROR I

THE COURT ERRED TO THE DETRIMENT OF [FATHER] WHEN IT ADMITTED A STALE TRANSCRIPT OF LEGAL PROCEEDINGS INTO EVIDENCE THUS RELIEVING [CSB] OF ITS BURDEN OF PRODUCTION AND BURDEN OF PROOF AND DEPRIVING FATHER OF HIS DUE PROCESS RIGHTS.

{¶15} Father's first assignment of error is that the trial court committed reversible error by admitting into evidence the transcript of the prior permanent custody hearing. Several weeks before the final hearing, CSB filed a written motion for the trial court to admit the transcript from the prior permanent custody hearing to enable the agency to streamline its presentation of evidence. None of the parties filed anything to oppose that motion. The day before the hearing, the trial court filed a written order to allow the admission of the transcript into evidence.

{¶16} At the final hearing, the transcript was admitted into evidence as an exhibit, without objection by any of the parties. Although Father did not attend the permanent custody hearing, he

was represented by counsel throughout the proceedings. Consequently, Father has forfeited all but plain error on appeal. *See*, *e.g.*, *In re T.B.*, 2014-Ohio-4040, ¶ 12 (9th Dist.).

{¶17} Father has not developed a plain error argument, nor has he cited any authority to support his position that the trial court erred in admitting the transcript from the prior hearing. Father suggests only that the evidence was not relevant because it involved circumstances from seven months earlier. He fails to argue or demonstrate, however, how evidence about the circumstances of the parents and children at an earlier point in the same case was not relevant to the trial court's ultimate determination about the best interests of the children. Because Father has failed to demonstrate any error, much less plain error, his first assignment of error is overruled.

### FATHER'S ASSIGNMENT OF ERROR II

THE COURT ERRED TO THE DETRIMENT OF [FATHER] WHEN IT FOUND THAT [CSB] PROVIDED REASONABLE EFFORTS AT REUNIFICATION WHICH WAS JUSTIFIED BY NEITHER THE SUFFICIENCY-OF-THE-EVIDENCE NOR MANIFEST-WEIGHT-OF-THE-EVIDENCE.

{¶18} Through his second assignment of error, Father asserts that the trial court erred by finding that CSB had made reasonable efforts to reunify him with his children. Any error in that finding would be harmless, however, unless it was essential to the permanent custody judgment. Father has failed to demonstrate that the trial court was required to make a finding of reasonable reunification efforts at the permanent custody stage of the proceedings. *In re L.A.*, 2023-Ohio-1877, ¶ 8 (9th Dist).

{¶19} R.C. 2151.419(A) specifically required CSB to establish, and the trial court to find, that the agency made reasonable efforts toward reunification or to prevent the continued removal of Father's children from the home:

at any hearing held pursuant to section 2151.28 [shelter care], division (E) of section 2151.31 [ex parte emergency temporary custody], or section 2151.314 [shelter care placement], 2151.33 [pre-adjudication temporary placement], or

> 2151.353 [disposition following adjudication] of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home[.]

R.C. 2151.419(A). CSB was not required to demonstrate that it made reasonable reunification efforts at the permanent custody hearing unless it had not done so at one of the prior hearings set forth in R.C. 2151.419(A)(1). *In re C.F.*, 2007-Ohio-1104, ¶ 43. Father does not argue that the trial court failed to make the requisite findings at those prior hearings or that the findings were not proper, nor did he challenge any of those findings in the trial court.

{¶20} Father's primary argument is that CSB failed to work with him on reunification after he was released from incarceration in May 2024, four months before the final hearing. Father was represented by counsel throughout these proceedings but never raised any challenge to the reunification efforts exerted by CSB. If he believed that the services offered by CSB under the existing case plans were not sufficient, his trial counsel could have filed proposed case plan amendments but did not. *See* R.C. 2151.412(F)(2) ("Any party may propose a change to a substantive part of the case plan[.]"). Father also failed to raise any issue about the agency's reunification efforts at the permanent custody hearing.

{¶21} From the beginning of this case, the case plan required Father to maintain contact with the caseworker and to contact the agency upon his release from incarceration to make his intentions known about whether he wanted to assume a parental role in his children's lives. Father was released from incarceration approximately four months before the permanent custody hearing, but he failed to contact CSB, the children, the guardian ad litem, or the trial court after his release. Mother testified that she had been in contact with Father since his release. The caseworker further testified that she did not know where Father was, but that she had repeatedly called him and left messages at the phone number Mother had given her, but Father never returned her calls.

{¶22} The record demonstrates that Father's failure to work toward reunification with Li.F., La.F., and J.F. was the result of his own inaction, not any shortcomings by CSB. *In re L.A.*, 2023-Ohio-1877, at ¶ 12 (9th Dist). Father's second assignment of error is overruled.

## MOTHER'S ASSIGNMENT OF ERROR

> THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO [CSB] [AS THE JUDGMENT] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶23} Mother's sole assignment of error is that the trial court's permanent custody decision was against the manifest weight of the evidence. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶24} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶25} The trial court found that the first prong of the permanent custody test was satisfied because Li.F, La.F., and J.F. had been in the temporary custody of CSB for at least 12 months of a consecutive 22-month period. Mother does not dispute that finding, which is supported by the record. At the time CSB filed its most recent motion for permanent custody, these children had been in CSB's temporary custody for more than 14 months of the prior 22-month period.

{¶26} Next, the trial court was required to find that permanent custody was in the best interest of the children. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in R.C. 2151.414(D). *In re M.S.*, 2023-Ohio-1558, ¶ 25 (9th Dist.). The trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the children, their wishes, their custodial history, their need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). None of the factors set forth in R.C. 2151.414(E)(7) through (11) are relevant in this case.

{¶27} By the time of the hearing, this case had been pending for nearly two years. Mother's ability to interact with the children for the majority of that time had been limited to weekly, supervised visits, but Mother did not take advantage of most of those opportunities to see her children. Although Mother states in her brief that her visits with the children "were all unsupervised[,]" and went well, Mother was not permitted to have unsupervised visits with her children until this case had been pending for more than 18 months and after CSB filed its most recent motion for permanent custody of the children. Prior to that time, Mother's in-person visits were required to be supervised at the agency's visitation center or as arranged by the foster parents.

Mother was also permitted to have telephone calls or Zoom visits that were also required to be supervised.

{¶28} For the first year of this case, however, Mother refused to attend supervised visits at the agency's interaction center because she did not believe supervision was necessary. Mother arranged a few in-person visits with the children at their respective foster homes, so her in-person visits for the first year of the case were limited to those few visits. Mother had Zoom visits with the children, but those visits did not keep the younger children actively engaged and Mother did not always appear for the scheduled Zoom visits.

{¶29} There was also evidence before the trial court that Mother had been inconsistent throughout this case about whether she wanted to be reunified with her children. According to the caseworker, she had repeatedly asked Mother, "Do you want your children back? . . . [and ] [s]he's always said . . . I'm not sure. I don't think so. Sometimes I want to. Sometimes I don't." The caseworker expressed ongoing uncertainty about Mother's wishes because Mother never once expressed to her that she was willing to fight for her children.

{¶30} When cross-examined about this aspect of the caseworker's testimony, Mother stated that she did want her children back, but emphasized that she knew that they were in good homes and that Li.F. in particular had "come a long way[]" so "[t]hat's why I never fully answered [about wanting the children back]." Mother recognized that the children were making progress in counseling and other therapeutic services and admitted that she had not been involved in any of those services but had heard about them from the foster parents.

{¶31} Although the children had expressed their desire to return to Mother's custody, the guardian ad litem opined that permanent custody was in their best interest because Mother was unable to provide them with a safe and stable home. The guardian ad litem had more experience

with Mother and these children than the caseworker, as she also served as the guardian ad litem when Mother's children were removed from her custody in 2018. Although she did not give details about the prior removal of the children, the guardian ad litem had observed a significant decline in Mother's motivation to work toward reunification with her children. She explained that, in the 2018 case, Mother was highly motivated to get her children back and worked diligently on the reunification goals of the case plan to ensure that the children were returned to her custody.

{¶32} In this case, however, the guardian ad litem had seen minimal evidence that Mother was committed to reunification. Mother refused opportunities to visit her children or engage with any of their service providers, and she failed to accept help from CSB or others that might have enabled her to provide a suitable home for her children. Mother had not accepted personal responsibility for the upheavals of her family in 2018 or 2022 and had made little progress toward reunification in this case. Instead, Mother continued to blame her busy work schedule and other reasons for the circumstances of her family.

{¶33} These children had been removed from Mother's custody in two separate cases, had been in temporary placements for a total of more than two years, and needed a permanent stable home. CSB had been unable to find any suitable relatives who were willing and able to provide a permanent home for any of these children and neither parent was able to do so. In stable and structured homes, the children had made great progress in improving their emotional, behavioral, and developmental wellbeing. They needed permanency to allow their progress to continue.

{¶34} Given the evidence admitted at the hearing, Mother has failed to demonstrate that the trial court lost its way by concluding that permanent custody was in the best interest of Li.F, La.F., and J.F. *See Eastley* at ¶ 20. Mother's assignment of error is overruled.

### III.

**{¶35}** The parents' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

JILL FLAGG LANZINGER
FOR THE COURT

STEVENSON, J.
CARR, J.
<u>CONCUR.</u>

APPEARANCES:

ALAN M. MEDVICK, Attorney at Law, for Appellant.

ALEXANDRA HULL, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.