[Cite as *In re E.R.*, 2025-Ohio-4546.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: E.R.
     J.R.

C.A. Nos.    31472
               31473

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 23 05 0462
               DN 23 05 0463

DECISION AND JOURNAL ENTRY

Dated: September 30, 2025

HENSAL, Judge.

{¶1} Appellant, M.R. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her two minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Mother is the biological mother of E.R., born June 9, 2022; and J.R., born February 17, 2020. The children's fathers did not file briefs in this appeal.

{¶3} CSB became involved with this family during late May 2023, after the agency received referrals about potential physical abuse of E.R. and the poor condition of the family home. Mother initially refused to cooperate with CSB but later agreed to take 11-month-old E.R. to the hospital for an evaluation of her injuries.

{¶4}    E.R. was examined by a pediatrician in the emergency room at Akron Children's Hospital ("ACH").  Although the child had no broken bones, she had numerous bruises in various stages of healing on her head, chest, abdomen, back, and buttocks.  Mother stated that she did not know how the child was injured but that E.R. had recently fallen and that she might have been injured by then three-year-old J.R.  The pediatrician opined that the characteristics of the child's many bruises were abnormal for such a young child and suspected that the injuries were the result of non-accidental trauma.  Consequently, he made a referral for an evaluation by ACH's center for children at risk ("CARE Center"), a team of medical professionals who specialize in evaluating suspected child abuse by also ruling out potential nonaccidental or medical causes for children's injuries.

{¶5}    On May 26, 2023, CSB filed complaints to allege that E.R. was abused and that both children were neglected and dependent.  The allegations in the complaint focused primarily on the physical abuse of E.R., the condition of the home, and concerns that Mother was not properly supervising the young children or otherwise meeting their basic needs.  The children were removed from Mother's home and placed in the emergency temporary custody of CSB.

{¶6}    While in CSB's emergency custody, the agency took E.R. for an evaluation at the CARE Center to substantiate or rule out abuse.  The director of the CARE Center, Dr. McPherson, is a pediatrician and child abuse specialist.  He physically examined E.R. and reviewed the child's ACH medical records, which included the recent emergency room visit and several prior appointments with ACH's pediatric group.  The CARE center also conducted laboratory testing to eliminate blood disorders and other potential medical causes for E.R.'s extensive bruising.

{¶7}    Dr. McPherson opined that Mother's explanations were not consistent with the specific locations or extent of the E.R.'s injuries.  For example, he explained that small children

often fall but rarely bruise their buttocks, which is a naturally padded area of the body, particularly because this child still wore a diaper. He further did not believe that J.R., then only three years old, would have had the strength or developmental capacity to cause E.R.'s injuries. At some point during this case, Mother also suggested that the large family dog might have knocked E.R. down and caused her injuries. Dr. McPherson would later reject that explanation as well. Based on the extent and location of E.R.'s injuries, Dr. McPherson concluded that the injuries were consistent with child abuse.

{¶8} After a contested adjudicatory hearing, which focused primarily on E.R.'s injuries in the home where J.R. also lived, the trial court adjudicated E.R. abused and dependent and adjudicated J.R. dependent. By agreement of the parties, the children were placed in the temporary custody of CSB, the trial court adopted the case plan as an order of the court and found that CSB had made reasonable efforts to prevent the continued removal of the children. Mother did not file objections to the adjudications of her children and did not appeal to this Court. *See In re D.T.*, 2014-Ohio-2332, ¶ 25 (9th Dist.). Therefore, the case proceeded based on the unchallenged and conclusive adjudications of abuse and dependency of E.R. and the adjudication of dependency of J.R. *In A.S.*, 2025-Ohio-2621, ¶ 10 (9th Dist.), citing *In re H.F.*, 2008-Ohio-6810, ¶ 18.

{¶9} The case plan focused primarily on Mother's inability to keep her home safe and clean and provide appropriate care for her children. Mother initially engaged in in-home parenting instruction without the children. Mother cleaned up the home and made the necessary repairs. By February 2024, Mother had begun intensive hands-on parenting instruction with the children in her home with a behavioral health specialist from Bair Foundation ("Bair"). Because Mother showed progress in her ability to provide appropriate care for the children, CSB gradually decreased the level of supervision of her visits and eventually permitted her to have unsupervised

visits in her home. Mother continued to make case plan progress, so CSB requested, and was later granted, a first six-month extension of temporary custody.

{¶10} On May 24, 2024, by agreement of the parties, the trial court returned the children to Mother's custody under an order of protective supervision by CSB. For the next two months, the record does not reveal how often CSB visited the family home to observe its conditions or the children and/or when CSB had last seen the children or their home environment before the end of July.

{¶11} On July 28, 2024, however, local police were called to do a welfare check on the children because a relative had seen E.R. on a Facetime call with apparent bruises on her face and a swollen lip. One of the police officers who responded to the call would later testify that E.R. was visibly bruised and swollen, so he called the fire department to treat the child and transport her to ACH. He further observed that Mother was disheveled and slurring her words; the home was in a deplorable condition; and both children were filthy, with visible dirt caked all over them. The police removed the children from the home pursuant to Juvenile Rule 6.

{¶12} The children were treated by another attending pediatrician in the emergency room at ACH. E.R. had swelling and bruising all over her body and abrasions and extreme swelling on her face. The emergency room pediatrician did not believe that any of Mother's explanations (the child accidentally falling, the family dog knocking her over, and/or then four-year-old J.R. harming her) could have caused most of E.R.'s specific injuries, given their location and severity. After a physical examination, she diagnosed E.R. with "[f]acial bruising, left arm bruise, right arm bruise, contusion of the back unspecified laterality, left lower leg contusion, right lower leg contusion, tear of the frenulum of the upper lip, suspected child abuse."

{¶13} The emergency room physician did not observe any injuries on J.R. that were unusual for a child of his age, so she did not suspect abuse of J.R. She did observe that both children were hungry and filthy, so hospital staff bathed and fed them. Because the children were caked with dirt, it was difficult to get them clean. J.R.'s hair was matted and caked with dirt and feces, which could not be dissolved, so they had to cut off a patch of his hair. The emergency room medical team made another referral to the CARE Center.

{¶14} In his July 2024 consultation about E.R., Dr. McPherson observed that the child had more extensive injuries than she did when he examined her in May 2023. He initially explained that the bruising of E.R.'s forehead did not necessarily concern him because children of E.R.'s age, then two years old, frequently fall and bruise their foreheads. He opined that most of the child's other injuries were abnormal for a two-year-old child. He explained that, when children fall, they also tend to injure their knees, shins, and/or arms. E.R. instead had numerous injuries in patterns, distributions, and locations that were unusual for a young child.

{¶15} Dr. McPherson explained that the bruises on E.R.'s upper arm had circular bruising patterns that were consistent with a grab or impact by adult fingers or knuckles. He also expressed concern about "small abrasions and bruises to [E.R.'s] right neck and right jawline underneath the earlobe[,]" because "[t]hat area is very much protected from accidental household falls." After updated testing to rule out underlying medical causes for the child's injuries, Dr. McPherson also ruled out explanations offered by Mother for the child's injuries, and concluded that E.R. had been physically abused. Given that E.R. was again with the same caregiver (Mother), he believed that the child was at risk of ongoing physical abuse or neglect. Dr. McPherson further noted that the tear inside E.R.'s lip would have been extremely painful. Mother had not sought any medical treatment for E.R., however.

{¶16} Both children were placed in the emergency temporary custody of CSB through an ex parte magistrate's order. Mother later waived her right to a contested hearing about the second removal of the children and their return CSB's temporary custody. She also agreed that CSB had made reasonable efforts to prevent the removal of the children from her custody. Mother was later charged with child endangering in the Barberton Municipal Court. Those criminal charges remained pending throughout this case.

{¶17} At the team decision meeting held the same day, Mother agreed to engage in more frequent services with the Bair behavioral health specialist, obtain a more thorough parenting and mental health assessment, and follow all recommendations that resulted from that assessment. The case plan was later amended, without any objection, to add those reunification goals for Mother. Mother's contact with the children was scaled back to weekly, one-hour, closely supervised visits until Mother engaged in more intensive reunification services and demonstrated that she no longer posed a threat to the children.

{¶18} After the second removal of the children, however, Mother did not obtain the required parenting assessment or engage in more frequent parenting services. In fact, she stopped engaging in reunification services altogether. Mother's behavioral health specialist from Bair tried repeatedly, but unsuccessfully, to contact Mother. She called Mother, left voicemail messages, and sent text messages, but Mother never replied to her. She expressed concern that Mother had been highly engaged in parenting services earlier in this case but ceased all contact after the children were removed the second time. Mother stopped coming to scheduled visits with the children, so she was ultimately removed from the visitation schedule.

{¶19} On November 5, 2024, CSB moved for permanent custody of both children. Mother alternatively requested an extension of temporary custody so she would have more time to

work on the reunification goals of the case plan. Following an evidentiary hearing, the trial court terminated parental rights and placed E.R. and J.R. in the permanent custody of CSB. Mother appeals and raises three assignments of error.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO [CSB] WHERE THE AGENCY FAILED TO DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT IT MADE REASONABLE EFFORTS TO PREVENT THE CONTINUED REMOVAL OF THE CHILD[REN] AND TO REUNIFY THE FAMILY.

{¶20} Mother's first assignment of error is that the trial court erred in granting permanent custody to CSB because it improperly found that CSB made reasonable efforts to reunify her with her children. Any error in that finding would be harmless, however, unless it was essential to the permanent custody judgment. Mother has failed to demonstrate that the trial court was required to make a finding of reasonable reunification efforts at the permanent custody stage of the proceedings. *See In re L.A.*, 2023-Ohio-1877, ¶ 8 (9th Dist).

{¶21} Revised Code Section 2151.419(A) specifically required CSB to establish, and the trial court to find, that the agency made reasonable efforts toward reunification or to prevent the continued removal of Mother's children from the home:

at any hearing held pursuant to section 2151.28 [shelter care], division (E) of section 2151.31 [ex parte emergency temporary custody], or section 2151.314 [shelter care placement], 2151.33 [pre-adjudication temporary placement], or 2151.353 [disposition following adjudication] of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home[.]

R.C. 2151.419(A)(1). CSB was not required to demonstrate that it made reasonable reunification efforts at the permanent custody hearing unless it had not done so at one of the prior hearings set forth in Section 2151.419(A)(1). *In re C.F.*, 2007-Ohio-1104, ¶ 43. Beginning with the first

shelter care hearing, the magistrate found that CSB had made reasonable efforts to prevent the removal of the children at numerous hearings throughout this case. Mother does not argue that those findings were not proper, nor did she object to or move to set aside any of those findings in the trial court. Moreover, Mother stipulated to many of the trial court's reasonable efforts findings, including at the initial dispositional hearing and adoption of the case plan, several review hearings, and at the shelter care hearing following the second removal of the children from her home in July 2024.

{¶22} Furthermore, insofar as Mother asserts that CSB failed to provide her with specific services, she has mischaracterized the facts in the record. Initially, Mother points to the fact that her parenting services were delayed because she was placed on a waitlist and later lost her phone and was unable to communicate with a service provider at Bair. Despite the delays in reunification services at Bair, however, Mother was later able to complete those services and be reunified with her children during May 2024.

{¶23} After the children were again removed from her custody in July 2024, Mother faults CSB for a five-month gap in her visits with the children and her inability to engage in case plan services because she lacked transportation. The evidence in the record is undisputed, however, that Mother had no visits with the children for five months because she failed to communicate with CSB and was ultimately removed from the visitation schedule. Her visits were reinitiated in January 2025, after she communicated with CSB. The caseworker further testified that, as soon as Mother informed her late in the case that she lacked transportation, CSB began making transportation arrangements for Mother.

{¶24} The record clearly demonstrates that Mother's inability to work on the case plan to be permanently reunited with her children was the result of her own actions or inaction, not any

lack of services provided by CSB. *See In re L.F.*, 2025-Ohio-1643, ¶ 22 (9th Dist.). Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT'S DECISION GRANTING PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT IN THE BEST INTEREST OF THE CHILD[REN].

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN FAILING TO CONSIDER LESS RESTRICTIVE ALTERNATIVES TO PERMANENT CUSTODY, SUCH AS LEGAL CUSTODY OR KINSHIP PLACEMENT.

{¶25} Mother's second and third assignments of error will be addressed together because they are interrelated. Her second assignment of error is that the trial court's permanent custody judgment was against the manifest weight of the evidence. Her third assignment of error is that the trial court did not adequately consider the best interest factor set forth in Section 2151.414(D)(1)(d), which pertains to whether the children could have achieved a legally secure permanent placement through a less drastic disposition than termination of her parental rights. This court will address her argument in the review of that statutory best interest factor.

{¶26} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under Section 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on

an analysis under Section 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶27} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶28} The trial court found that the first prong of the permanent custody test was satisfied because, during the two separate periods that the children were removed from Mother's custody, they had been in the temporary custody of CSB for a total of more than 12 months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d). The trial court also found that the children could not or should not be returned to Mother's custody because she had "failed continuously and repeatedly to substantially remedy the conditions" that had caused the children's initial, subsequent, and ongoing removal from their home. R.C. 2141.414(B)(1)(a); 2151.414(E)(1). Mother does not challenge either of those findings, which were fully supported by the record.

{¶29} Next, the trial court was required to find that permanent custody was in the best interest of the children. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in Section 2151.414(D). *In re M.S.*, 2023-Ohio-1558, ¶ 25 (9th Dist.). The trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the children, their wishes, their custodial history, their need for permanence and whether that can be achieved without a grant of permanent

custody, and whether any of the factors outlined in Section 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). None of the factors set forth in Section 2151.414(E)(7) through (11) were alleged to be relevant in this case.

{¶30} Beginning with the interaction and interrelationship of E.R. and J.R. with other significant adults in their lives, the children visited regularly with Mother at the beginning of this case; the visits went well and were expanded; and the children returned to Mother's home in May 2024.

{¶31} While back in Mother's custody for two months, it is unclear from the record exactly when the problems arose but, by the end of July, Mother was not providing even minimal basic care for her children. After the second removal, it was evident that E.R. had again suffered physical abuse, which was more severe than it had been two months earlier; and both children were hungry and extremely filthy. After the second removal, Mother had no contact with these very young children for the next five months, despite having the opportunity to have weekly, supervised visits.

{¶32} On the other hand, the children did very well in their kinship placement with a paternal great aunt. The children had been placed in the paternal great aunt's home after the initial removal from Mother's home and again after the second removal following a placement in foster care because CSB could not immediately reach the great aunt. The children were bonded to each other and their great aunt, had remained placed together throughout their lives, and all their needs were being met in a safe and secure environment. Neither child sustained any suspicious injuries while living with the paternal great aunt.

{¶33} Because the children were only two and five years old at the time of the hearing, the guardian ad litem opined that they were too young to express their wishes. Despite Mother's

statements to the contrary in her brief, the guardian ad litem did not mention any other dispositional option for the children at the time of the hearing. Her unequivocal recommendation was that it was in the best interest of the children to be placed in the permanent custody of CSB. Through both her written report and her testimony at the hearing, the guardian ad litem emphasized that it was in the children's best interests to find a permanent home and Mother was not able to provide such a home. She expressed serious concern that E.R. had sustained more serious injuries in July 2024 than in May 2023, even though Mother had engaged in case planning services for over one year.

{¶34} Finally, no one disputed that the children needed a legally secure permanent placement, as these very young children had spent two years moving in and out of temporary homes. They had been removed from Mother's home twice, moved into foster care, then to the home of the paternal great aunt. They were very young children, fully dependent on their caregivers, and needed stability.

{¶35} Mother asserts that, rather than terminating her parental rights, the trial court should have placed the children in the legal custody of her sister, a maternal aunt. Although the trial court heard testimony about the paternal great aunt, who was the children's kinship caregiver, there was no evidence before the trial court that the maternal aunt was interested in assuming the role of the children's legal custodian, much less that she would be appropriate to do so. The caseworker explicitly testified that the maternal aunt had not been consistent in expressing an interest in having the children placed with her, so CSB did not pursue her as a potential legal custodian.

{¶36} When Mother's counsel asked the guardian ad litem about whether Mother had mentioned the aunt as a potential placement for the children, she could not remember. In her

written report, the guardian ad litem explicitly stated that "[t]he children are in need of [a] legally secure placement which cannot be achieved without the grant of permanent custody of the children to CSB."

{¶37} Furthermore, Mother could have filed a motion for legal custody to the maternal aunt, but she did not. The record also fails to include the required statement of understanding signed by aunt, and aunt did not appear at the hearing to testify about her interest in legal custody. *See* R.C. 2151.353(A)(3). Consequently, Mother has failed to demonstrate that the trial court erred by failing to consider a less drastic option of legal custody to the maternal aunt when the court had no legal custody motion before it. *See id.*

{¶38} Given the evidence before the trial court, Mother has failed to demonstrate that the trial court did not fully consider all the best interest factors or that it lost its way by concluding that permanent custody was in the best interest of E.R. and J.R. Mother's second and third assignments of error are overruled.

III.

{¶39} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

FLAGG LANZINGER, P. J.
CARR, J.
CONCUR.

APPEARANCES:

VICTOR O. CHUKWUDELUNZU, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and ASHLEE JAMES, Assistant Prosecuting Attorney, for Appellee.

SALLY PRENTICE, Attorney at Law, for Appellee.

STEPHEN M. GRACHANIN, Attorney at Law, for Appellee.

SHUBHRA AGARWAL, Guardian ad Litem.